IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNE MARIE BLOOD, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| | : | NO. 20-3665 |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI[1], | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    August 25, 2022

This action was brought pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), which denied the application of Anne Marie Blood ("Blood") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act").  Presently before the Court is Plaintiff's Brief and Statement of Issues in Support of Request for Review ("Pl. Br.") (Doc. 19); Defendant's Response to Plaintiff's Request for Review ("Def. Br.") (Doc. 20); and the record of the proceedings before the Administrative Law Judge ("ALJ") (Doc. 6) (hereinafter "R."). Plaintiff asks the Court to reverse the decision of the ALJ.  The Commissioner seeks the entry of an order affirming the decision of the ALJ.  For the reasons set forth below, we deny the request for review and affirm the ALJ's decision.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, therefore, she should be substituted for Andrew Saul as Defendant in this suit.  *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I.     FACTUAL AND PROCEDURAL HISTORY

Blood filed her claim for DIB on May 24, 2016, alleging disability arising from a number of conditions, including seizure disorder, major depressive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), and post-traumatic stress disorder.  (R. 10, 13.)  She had a high school education and work history as a general office clerk and a gas station clerk.  (R. 20.)  Despite having dated the onset of her alleged disability to January 1, 2014, Blood's earnings records showed continued work in 2014 for a business owned by her brother and at a level that exceeded what would constitute substantial gainful activity under the Act.  She also had self-employment earnings in 2014 from a consignment business that she ran for a few years.[2]  (R. 12.)  Outside of her paid work, she had lived with and helped to care for her ill father, and, in her words, "took care of both of [her] parents for like 25 years." (R. 61.)  When her mother transitioned to a nursing home, Blood would visit her "every day" until she passed in 2017.  (R. 62.) By 2019, another brother, who was on disability, was living with her and she helped him manage his medicine regimen and prepared simple meals for him.  (R. 59-61, 69.)

Blood believed she could not work because she could not "take any pressure" and would cry if someone yelled at her or corrected her.  (R. 64.)  She also cited the length of time it took her to learn something at a job.  (*Id.*)  She recounted that she has "gone out and tried to get jobs and [has] just cried in the elevator and laughed and didn't go in." (*Id.*)

As of her alleged disability onset date of January 1, 2014, Blood was bringing complaints of ADHD and depression symptoms to her primary care provider, Andrea Pellegrino, M.D.  She

---

[2]   Her earnings records also included income, although greatly reduced from 2014, from her brother's business in 2015.  Blood testified at the hearing, however, that the only payment she received in 2015 was a loan repayment from her brother.

acknowledged that she had discontinued previously-prescribed medications because she did not like how they made her feel. Dr. Pellegrino ordered Adderall and Lorazepam, following which Blood reported that the Adderall helped her focus better but that her anxiety had worsened and that she was crying a lot and feeling stressed. Dr. Pellegrino also prescribed Xanax, Lexapro, and Wellbutrin. At the same time, Blood acknowledged that she was using marijuana daily. *See* R. 15 (describing contents of Ex. 6F). Dr. Pellegrino and her colleagues worked to adjust her medications to relieve continued anxiety. Blood continued to see Dr. Pellegrino through April 2015 for her mental health concerns, even as she discontinued many of her medications on her own. *See* R. 16 (same).

In January 2016, Blood sought treatment for her mental health concerns at Life Counseling Services, where she described upon intake her uncontrolled symptoms of depression and anxiety. She reported that she was using marijuana "all day" and every day. *See* R. 16 (describing contents of Ex. 3F).[3] Upon evaluation, she was noted to have soft speech, distracted concentration and attention, psychomotor retardation, blunted affect, racing thoughts, poor judgment, and poor insight. (*Id.*) A psychiatrist at the clinic took charge of prescribing her medications. (R. 17.) Treatment records through April 2016 showed symptoms varying based upon her compliance with the prescribed medications and her marijuana use, which her therapist noted had "interfered with the progress of an antidepressant" and "contribut[ed] to her anxiety, concentration, focus, and decision-making abilities." (R. 17, citing Ex. 3F.) Following a medication-induced stroke in late

---

[3] At future counseling sessions, her therapist noted her complaints of continued depression and anxiety with little improvement, and that Blood smoked marijuana "constantly throughout the day," which the therapist posited was "probably contributing to her high level of anxiety and depression." (*Id.*) By the time of her hearing in 2019, Blood had a prescription for medical marijuana for breathing difficulties related to her use of cigarettes. (R. 73-75.)

April 2016 that resulted in her temporarily losing her driving privileges, Blood discontinued treatment at the Life Counseling Services clinic.

In August 2016, with her DIB claim pending for an initial determination, Blood began mental health treatment at the Penn Foundation. She saw Fahad Ali, M.D., and later Olga Kessel, M.D., the clinic psychiatrists who took charge of medication prescribing. She also met regularly with a therapist. That treatment continued through at least September 2018.

The state agency denied Blood's DIB claim on September 1, 2016. (R. 96-100.) She requested a hearing before an ALJ, which was ultimately held by video on January 9, 2019, after an earlier proceeding was continued so that she could obtain representation. (R. 10.) An impartial vocational expert ("VE") also appeared at the hearing.

On January 31, 2019, the ALJ issued his written decision that Blood was not disabled at any time from her alleged onset date at the beginning of 2014 to the date her DIB insured status expired on December 31, 2016.[4] (R. 10-22.) Blood requested review, but the Appeals Council determined on May 27, 2020 that there was no reason to set aside the ALJ's decision, rendering it the final decision of the Commissioner. (R. 1-6.) This litigation followed.

## II.    STANDARD OF REVIEW

This Court must determine whether the ALJ's conclusion that Blood could perform jobs that existed in sufficient numbers in the national economy prior to the expiration of her insured status is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F. 3d 546, 552 (3d Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable

---

[4] DIB claimants bear the burden of proving disability prior to the expiration of their insured status. A claimant who becomes disabled after her date last insured is not entitled to DIB. *See* 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). *See also Matullo v. Bowen*, 926 F.2d 240 (3d Cir. 1990).

mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *See also Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford*, 399 F.3d at 552. The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence. *Richardson*, 402 U.S. at 390 (citing 42 U.S.C § 405(g); *Rutherford*, 39 F.3d at 552). The review of legal questions presented by the Commissioner's decision, however, is plenary. *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III.   DECISION UNDER REVIEW

The issue before the ALJ at the time of his January 31, 2019 decision was whether Blood had been disabled within the meaning of the Act after January 1, 2014, her alleged disability onset date, and before December 31, 2016, her date last insured. The ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) to reach his conclusion. At Step One, he found that Blood had not engaged in substantial gainful activity "during the period elapsing after 2014" and through her date last insured, although he found that she *had* engaged in substantial gainful activity "during 2014" based on her earnings records. (R. 12.) At Step Two, he found that Blood suffered from severe, medically-determinable impairments, specifically seizure disorder, major depressive disorder, generalized anxiety disorder, and attention deficit – hyperactivity disorder (ADHD). (R. 13.) At Step Three, he concluded that Blood did not have an impairment or combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (R. 15-17.) Plaintiff does not challenge these findings.

The ALJ then considered Blood's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  The ALJ determined:

> **5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she could not tolerate exposure to high concentrations of dust, fumes, gases, and other pulmonary irritants; she was not able to tolerate exposure to excessive vibration; she could work in hazardous environments; she was not able to climb ladders or similar devices; she was limited to simple, routine and repetitive tasks only; she could not do tasks requiring more than occasional public contact and could do tasks with a strong production pace requirement.**

(R. 14.)  In light of the VE's characterization of the requirements of Blood's prior employment positions as a general office clerk and gas station clerk, the ALJ found at Step Four that these jobs involved non-exertional or mental demands that exceeded Blood's RFC.  The ALJ thus found that Blood was unable to perform her past relevant work.  (R. 20.)

At Step Five, the ALJ assessed whether Blood was capable of performing any other jobs that existed in significant numbers in the national economy considering her age (as a "younger individual" as of the expiration of her insured status), her high school education, and her RFC.  At the hearing, the VE had testified that a hypothetical individual with the capabilities that the ALJ ultimately found Blood possessed could perform the functions of several representative unskilled occupations, whether at the light exertional level (mailroom clerk and merchandise marker) or at the medium exertional level (hand packager).  (R. 21.)[5]  Given this testimony and what became his RFC finding, the ALJ concluded that Blood had been capable of making a successful

---

[5] As we discuss below, a different hypothetical was also posited to the VE regarding an individual whose anxiety caused many absences from work.

adjustment to other work in the national economy during her alleged disability period and thus was not disabled. (R. 21.)

## IV.    DISCUSSION

Blood contends that the ALJ's RFC finding — that she can maintain a job at the level of substantial gainful activity — is not supported by substantial evidence and is the product of legal error.  She contends that the ALJ disregarded what she characterizes as "credible testimony of the [VE]" that if Blood's anxiety caused her to be off task for a significant portion of the day or it caused her to miss at least two days of work a month, then her condition would be considered work-preclusive.  (Pl. Br. at 4-5.)  She contends that the limitations put forth in this alternative hypothetical to the VE were "consistent with" her hearing testimony and treatment record, as she believes that a treating provider offered an opinion that her anxiety and depression limited her in this way.  (*Id.* at 5-6.)  The Commissioner asserts that Plaintiff pointed to no evidence that would compel a finding that she would miss at least two days of work per month or be off task for a significant portion of the day and that the ALJ's decision, which was otherwise supported by substantial evidence, cannot be disturbed.

### A.    The ALJ did not err in the weight given to a medical opinion.

In her brief, Plaintiff recounts the standards that have been set forth in the Regulations concerning the weight to be given to a treating source's opinion.  (Pl. Br. at 5.)  She continues with an argument that "the opinion of the Plaintiff's treating provider identified hereinabove are entitled to controlling weight" and that "[t]hose opinions establish the Plaintiff's symptoms in connection with her anxiety and depression which limits her ability to work a full day without breaks and limits her ability to work without missing several days a month."  (*Id.* at 5-6.)

We are at a bit of loss, however, to identify what treating source opined that Blood would be limited in her ability to complete a full workday or a full month of employment without taking breaks or missing days, as Plaintiff argues.  The only medical records described in her brief in any detail – apart from a list in support of the observation that she had a "consistent history of treatment for the issues" about which she testified (Pl. Br. at 4) – is a reference to the initial psychiatric evaluation that she underwent on August 30, 2016 with Dr. Ali of the Penn Foundation.  *See* Pl. Br. at 4 (citing R. 658 & 661).  This was during a time when she had discontinued taking many of her prior medications (filled through her primary care physician) following her seizure episode four months earlier.

In the report of that evaluation, Dr. Ali memorialized that Blood recounted that she was experiencing panic attacks 4 times per week.  (R. 658.)  He documented her mental status, which reflected low, slow, and soft speech; sad mood; constricted affect; that she became tearful when speaking of her parents; but which was otherwise normal.  (R. 661.)  He diagnosed "Major Depressive Disorder, Recurrent, Severe Without Psychotic Features," Generalized Anxiety Disorder, and ADHD.  (*Id.*)  Dr. Ali recommended at that time that Blood consider a "higher level of care" such as a "partial program" – presumably a partial hospitalization program – "due to severity of depression."  (R. 662.)[6]  Once she embarked on Dr. Ali's medication management plan, she reported improvements in her panic attacks.  *See* R. 650 (denied panic attacks at her next

---

[6]  The program recommended to Blood did not accept her insurance, so she did not pursue that option.  (R. 658.)  When Dr. Ali made subsequent recommendations for programs at a higher level of care, they do not appear to have been pursued by Blood.  *See, e.g.,* R. 652 (at check-up on September 27, 2016, other "psychiatric rehabilitation services" suggested).  Neither did Blood pursue a peer-to-peer program recommended by her therapist, citing transportation issues.  (R. 654.)  She did eventually begin working with a "recovery coach."  (R. 647.)

medication management check-up with Dr. Ali); R. 641 (again denied panic attacks at November 30, 2016 check-up).

At neither the initial evaluation nor at any of the psychiatrist check-ups, however, did Dr. Ali express an opinion of Blood's residual functional capacity.  Plaintiff may be characterizing as Dr. Ali's opinion his documentation of the symptoms she reported to him and *her own* perception of the limitations that would arise from such symptoms.  She conjures up a purported opinion rendered by Dr. Ali from a blend his treatment notes, her testimony, and the VE's response to one of the hypothetical questions posed at the hearing.  Her brief appears to argue, for example, that because the ALJ posed a question to the VE about a *hypothetical individual* who would have to miss work or would be off-task due to anxiety, the VE's response became affirmative "expert testimony" describing *Blood's* limited capacity for work.  But the hypothetical question was nothing more than a hypothetical, and the VE certainly did not purport to offer an opinion as a treating *medical* source about Blood's capabilities.  We agree with the Commissioner's observation, in her brief, that the referenced evaluation by Dr. Ali "recorded no specific work-related reports nor made a medical assessment of any."  (Def. Br. at 7.)[7]  As there was no treating medical opinion in the record, the ALJ did not err concerning the weight given to such an opinion.

**B.     The ALJ's RFC finding – that Plaintiff would be able to complete a normal workday and workweek – is supported by substantial evidence.**

In the absence of the medical opinion evidence that Plaintiff believes the ALJ ignored, we review the decision generally to see if the ALJ's conclusions are supported by substantial evidence. We note that the parties' briefs paint somewhat different portraits of Plaintiff, her motivation to work, the impact of her use of marijuana, and how her care for ill and impaired family members

---

[7]  Inasmuch as we do not see how there could be a factual dispute on this point, we query whether Plaintiff's counsel has simply made a mistake in the brief.  He did not file a reply to counter the Commissioner's characterization of the cited medical note as falling short of a medical opinion.

may reflect on her ability to work.  There is no dispute that the ALJ accepted in his RFC finding that Blood's mental health impairments gave rise to moderate limitations in many areas of functioning, such that he restricted her to work involving only simple, routine and repetitive tasks; that these tasks could require only occasional public contact; and that her work tasks could not involve a strong production pace requirement.  The ALJ implicitly found her capable of maintaining work at the level of substantial gainful activity, which she had already proven herself capable of doing in the first year in which she alleged she was disabled.  *See* R. 14 (noting 2014 earning records).  The ALJ's finding about her ability to sustain work at the level of substantial gainful activity is supported by her ability to maintain a normal appearance, care for her mother, shop and take care of her own needs, and live independently.  (R. 14.)  The ALJ observed that she "related well" at the hearing.  (*Id.*)  The medical records do not reflect problems maintaining scheduled appointments.

The ALJ was well aware that Blood alleged that she was "unable to sustain the mental tasks of work, interact with others, maintain attendance, or sustain productivity within the customary tolerances of any work on a regular and continuing basis[.]"  (R. 15.)  However, he found that Blood's contentions about the limiting effects of her impairments were inconsistent with the record as a whole, as her treatment records from both her primary care and mental health providers showed that:

> [The] activities [in which she engaged] were more significant, her compliance with treatment and recommendations was highly questionable, and the mental status examinations were almost invariably objectively normal apart from some disturbances in mood and affect.

(R. 15.)  These observations are a fair recounting of the record.

We are mindful that it is not the role of the federal court to re-weigh the evidence before the ALJ.  Rather, the ALJ's decision will stand it if was supported by substantial evidence.  This decision was so supported.

## V.    CONCLUSION

We see no basis to reverse this case under sentence four of 42 U.S.C. § 405(g).  The ALJ complied with his obligation to evaluate the evidence and explain why he relied upon the evidence he did.  He did not violate any regulations regarding treating source medical opinions, as none were rendered in this case.

The request for review will be denied.  An appropriate order will follow.